Rockingham,
June 4, 1935.

REGINALD P. KENNARD *v.* ETHYL C. KENNARD.

ETHYL C. KENNARD *v.* REGINALD P. KENNARD.

*Robert W. Upton, John L. Mitchell* and *Ralph G. McCarthy (Mr. Upton* orally), for Reginald P. Kennard.

*Hughes & Burns* and *Marvin, Peyser, Tucker & Marvin (Mr. Hughes* orally), for Ethyl C. Kennard.

BRANCH, J. An examination of the record before us compels the conclusion that the plaintiff in the present proceedings did not have a fair trial. Because of the errors of law which are later indicated, the findings and orders made with reference to the petition of Reginald P. Kennard must be set aside and justice requires the granting of a trial *de novo*.

1. By the terms of the divorce decree, the custody of Reginald D. Kennard, the minor son of the parties, then about five years of age, was committed to the defendant, Ethyl C. Kennard, and William E. Marvin of Portsmouth, jointly, "to the exclusion from all association with the libellee, Reginald P. Kennard, his mother Wilhelmina S. Kennard and his brothers, Victor and Wilhelm Kennard."

In his present petition the plaintiff prays for a modification of the order in regard to custody and specifically for a dissolution of the provision which forbids him and the members of his family from having access to his son. These prayers were denied, and to indicate the basis for its action, the court reported certain facts which were "placed before the court at the original hearing. They were believed by the court and taken under consideration in determining the custody of their child." We quote from these findings.

"Certain letters of his written to Ethyl in October 1916 and January, 1917, disclose a knowledge of the movements of the German land

forces; and of the movements and whereabouts of the German submarine The Bremen, that could only be obtained by one in close touch with German Agents and in the letter written in October 1916 he said: 'The reason I have favored the Germans so strongly is because we have favored England in so many things.' "

It is also found that "shortly after he returned to New York from over-seas" Mr. Kennard took his wife to a meeting of German sympathizers in New York, which is described by the court as follows: "They ... approached a doorway of a residence from which no ray of light escaped. They were admitted through dark corridors, into a brilliantly lighted house—where were gathered an array of prominent Germans, among them being Reginald's mother, garbed in the uniform of a German nurse. Excepting when someone addressed Ethyl, German was the only language spoken.

"During his service in France he, was taken from the company over which he was Captain, and placed in charge of colored troops at the rear, burying the dead.

"It is inconceivable that one so pro-German as he before and after the war, as shown by his conduct, was loyal and faithful to his flag."

To the above quoted findings the plaintiff excepted upon the grounds, (1) that they were unwarranted by the evidence, and (2) contrary to the evidence. He also excepted specifically to the denial of the prayer for relief above set forth. These exceptions must all be sustained.

Even if the foregoing findings were fully sustained by the evidence, they would furnish no basis for the order denying Mr. Kennard all access to his son. Neither pro-German sympathy nor the vague lack of loyalty to the flag which the court suggests would justify a finding that the plaintiff, against whom no act of disloyalty is charged, was unfit to associate with his son, nor could the plaintiff lawfully be punished for disloyalty, if it were in fact proved that he had been disloyal, by excluding him and his family from all association with his son. Although other factors appear to have entered into the court's decision, the foregoing findings are included amongst the considerations which "to the court ... offered sufficient reason for a decree of custody to the mother, to the complete exclusion of all association with the father and those who had aided him." For this reason the present orders relative to custody must be set aside. In justice to the plaintiff however the findings themselves must be set aside, because they are supported by no substantial evidence.

The finding that "during his service in France he [the plaintiff]

was taken from the company over which he was Captain and placed in charge of colored troops at the rear burying the dead" is unwarranted by the evidence. The uncontradicted testimony of the plaintiff was that he was placed in command of a company of colored pioneer troops before he sailed from this country and he retained this command throughout the period of his service in France. The only evidence called to our attention as supporting the court's finding is found in the testimony of Mrs. Kennard, who first stated, "I don't know while he was over there what happened at all" but later continued, "I didn't think he was fighting abroad. I know he was over there with his men, his men were not fighters, they were not trained men. They were colored men, digging roads and repairing roads, things of that kind . . . I know he had had men that he trained before, and I don't know why they changed that way. I thought that was very peculiar. . . . I don't think he was given a responsible position at the very front with men that absolutely turned the tide of battle perhaps in fighting, no, I don't think he was. . . . in my mind I blame him for being changed from having trained troops to men who knew nothing about fighting."

As to the date when the plaintiff was placed in command of colored troops, this testimony is entirely consistent with his statement that he received this assignment before he was sent over-seas. Furthermore, it is perfectly plain that the testimony of Mrs. Kennard, which was expressly stated in many instances to embody only her own beliefs and conclusions, and which could obviously be based upon nothing but hearsay, furnished no legal basis for the highly derogatory findings of the court.

The evidence in regard to the meeting of German sympathizers in New York, the significance of which seems to be trivial, all shows that it occurred before the plaintiff went over-seas, which leaves the court's finding of pro-German sentiments entertained by the plaintiff after the war wholly without support.

In considering the letters above mentioned as evidence of the plaintiff's lack of loyalty, the court violated the law of the trial and made an unwarranted and prejudicial use of evidence admitted for a restricted purpose. The record shows that these letters were admitted, over the plaintiff's objection and subject to his exception, solely upon the question of his credibility. It was, therefore, error to consider them as the basis for a finding of fact in support of the original decree, and by the same token they furnished no justification for the denial of the prayer of the present petition.

Furthermore, the contents of the letters, if properly open to consideration, furnish no basis for the conclusion which the court drew from them, *i.e.* that the plaintiff was in close touch with German agents. His references to the German campaign in Rumania state no facts which were not matters of public knowledge, coupled with a prediction of Rumanian defeat such as any intelligent observer of current events would have made. His reference to the submarine "Bremen" indicates simply that he had been misled by unfounded rumors. The statement that the Bremen, "which everyone thinks never reached America came in but it has been kept out of the papers entirely," is contrary to historical fact.

The findings of lack of loyalty must, therefore, be set aside, and plaintiff's exception to the denial of his prayer for relief from the former orders in regard to custody must be sustained.

Upon the general question of custody there must be a new trial, but there is no occasion for further hearing as to the dissolution of the order excluding the plaintiff from all association with his son. If it be assumed that the original order was justified at the time it was made, in view of the character of the plaintiff's conduct toward his wife, no reasonable man could find upon the present record that there is now any occasion for this portion of the decree. It has, in fact, been treated as a dead letter by all the interested parties since 1926, when Mr. Kennard went to Cleveland at the suggestion of his former wife and visited his son there. Commencing in 1927, and continuing thereafter for five years, the boy spent every summer vacation with his father upon his farm in Greenland and during these visits, came in close contact with his grandmother and his uncles. These visits were arranged by his mother with the approval of Mr. Marvin, the co-custodian. There is no suggestion that the contacts between father and son have been detrimental either to the boy or to his relations to his mother. In fact, it is plain that these visits have been beneficial to the son. It is, therefore, ordered that this portion of the divorce decree, having no present justification, be, and it is hereby dissolved.

2. Multiple errors are disclosed in the record with reference to the prayer for revision of the decree as to alimony. The most fundamental of these errors lies in the court's apparent misapprehension of the nature and purposes of alimony. It is stated that "the award was of alimony to Ethyl as compensation for the inhuman treatment she received from her husband." This is not a proper basis upon which to compute the amount of alimony. Damages for personal

injuries or loss of affection cannot properly be assessed in divorce proceedings.

The classical English conception of alimony as provision for the support of a wife legally living apart from her husband after a divorce from bed and board (*Wallace* v. *Wallace*, 74 N. H. 256, 258) of course required modification as soon as absolute divorces were authorized by statute. Hence it has repeatedly been said that "alimony in this state is an allowance to the wife upon the termination of the marital relation by divorce." *Wallace* v. *Wallace*, 75 N. H. 217; *Sheafe* v. *Sheafe*, 24 N. H. 564; *Parsons* v. *Parsons*, 9 N. H. 309.

Nevertheless it is still recognized that the right to alimony is a corollary of "the natural and legal duty of the husband to support the wife" (*Wetmore* v. *Markoe*, 196 U. S. 68, 73 and cases cited) and that alimony does not partake of the nature of either damages or a penalty for misconduct. 1 R. C. L. Tit., Alimony, *s.* 4; *Fickel* v. *Granger*, 83 Oh. St. 101. "Alimony, as we all understand, is an allowance for support and maintenance, having no other purpose and provided for no other object." *Romaine* v. *Chauncey*, 129 N. Y. 566, 569.

Under our statute, alimony is primarily "an allowance for the support of the wife, which, under the circumstances it is considered, she ought not to be required to take at the husband's house." *Morrison* v. *Morrison*, 49 N. H. 69, 73. It is "the support which the court decrees in favor of the wife as a substitute for the common-law right of marital support." *Livingston* v. *Livingston*, 173 N. Y. 377, 387; *Brown* v. *Brown*, 222 Mass. 415; *Lynde* v. *Lynde*, 64 N. J. Eq. 736; *Bialy* v. *Bialy*, 167 Mich. 559, 565; *Stearns* v. *Stearns*, 66 Vt. 187; *Adams* v. *Storey*, 135 Ill. 448; 1 R. C. L. Tit., Alimony, *s.* 2.

Although it is held that the conduct of the husband may be taken into account in fixing the amount of alimony, (*Janvrin* v. *Janvrin*, 59 N. H. 23) this does not mean that damages for ill treatment are to be assessed against him or that he may be subjected to a penalty for misconduct in divorce proceedings. It simply means that proof of inhuman or brutal treatment on his part may serve "to make the court less considerate of his situation and more liberal in its view of the necessities of the wife." *Romaine* v. *Chauncey*, *supra*, 570. Nothing more than this is to be inferred from the language used by this court upon the previous transfer of this case when it was said, "he was justly required by the court to make a liberal allowance of alimony to his wife, as a recompense in some degree for the neglect and ill-treatment which, it could be found, she had endured at his hands." *Kennard* v. *Kennard*, 81 N. H. 509, 513.

In the course of a statement to the court during the recent hearings, counsel for Mrs. Kennard said, "I should judge, reading the decree and reading the evidence and reading the opinion of the Supreme Court, that there was a decree made based partially on compensation to Mrs. Kennard, partially on penalty for conduct disclosed during the course of the trial." The record does, indeed, point to this conclusion, and so far as the award of alimony included the assessment of a penalty against the plaintiff, it is unlawful.

In determining the amount to be awarded as alimony in a given case, the size of the husband's estate is obviously a vital factor to be considered. "A decree for alimony is never passed unless an ability to make the payment is shown. Such is the rule in this State; and the evidence in regard to the income and property of the party against whom the decree is sought, should be as clear and satisfactory as the circumstances will permit." *Sheafe* v. *Sheafe*, 36 N. H. 155, 157.

The original decree for alimony in this case was based upon a finding that the value of the portion of the trust fund in which the plaintiff had a vested interest as remainderman, was $120,000. This finding in turn appears to have been based upon a stipulation of the parties to the effect that under the will of William Schaus, the plaintiff, if living at the death of his mother Wilhelmina S. Kennard, "will receive an estate of approximately One Hundred Thirty Thousand (130,000) Dollars, less federal and state taxes." The petition for revision of the decree alleged that since the date of the award there had been a substantial shrinkage in the plaintiff's estate. The plaintiff requested the court to find the present value thereof and excepted to the denial of this request. This exception must be sustained.

A comparison between the adjudicated value of the plaintiff's estate in 1923 upon which the award of alimony was based, and its value when it became available for satisfaction of the decree, was essential to a determination of the question whether the amount of the award represented a fair share of the plaintiff's estate when the time for payment arrived. The court, in effect, refused to make such a comparison, and for this reason there must be a new trial of this issue. If it should be found, as the plaintiff claims, that the value of his estate is now less than $85,000 instead of $120,000, some downward revision of the order for alimony would appear to be imperative.

At the final hearing on January 2, 1934, evidence was received, subject to the plaintiff's exception, to show the market value, as of

October 15, 1923, of the securities assigned to Mr. Kennard on the final settlement of the trustee of the Schaus fund. The purpose of this offer was thus stated by counsel for Mrs. Kennard: "Your Honor has been led to believe that counsel signed an agreement that there were $130,000. in the estate coming to Mr. Kennard. We say that that paper, exhibit 46, absolutely disproves any such statement as that." The evidence was also offered to show that the securities assigned to Mr. Kennard "have appreciated since your decree was made." The argument is that there has been no depreciation in the value of the plaintiff's estate because his securities were not worth the adjudicated value of $120,000 in 1923, and are, in fact, worth as much today as they were then.

The defendant is in no position to claim the benefit of this argument at this time. The award of alimony having been based upon an adjudicated value of $120,000, this fact became *res adjudicata* as between the parties. Therefore, upon the present petition for modification, the only material comparison of values is one between the adjudicated value in 1923 and the actual present value of his estate. If there had been a prayer by either party for a revision of the original decree upon the ground of mutual mistake as to the value of the plaintiff's share in the Schaus fund as evidenced by the stipulation above referred to, evidence of the actual value of the securities in 1923 would have been admissible, but for the defendant to insist that the original award was proper and still to introduce evidence that the basis upon which it rested was erroneous in order to disprove the plaintiff's claim of depreciation, was not permissible. Evidence of the actual values in 1923 was immaterial and inadmissible with reference to any issue properly before the court in these proceedings and its effect was plainly prejudicial to the rights of the plaintiff.

3. The court found that the letter written by plaintiff's counsel to the trustee of the Schaus fund on December 31, 1931, was "a deliberate attempt to interfere with the court's decree and payment thereunder by the trustee and constitutes a contempt of court." To this finding the plaintiff excepted, and it is now argued that this letter "was merely a strongly phrased statement of Mr. Kennard's intention to take appropriate action for the revision or modification of the decree . . . . Notice to the trustee of the intended petition for revision was necessary to the protection of Mr. Kennard's rights pending the actual filing of the petition. It was given in good faith and calculated to preserve the *status quo* until his rights could be determined."

If the letter is open to this construction, it is plain that the interpretation placed upon it by the court is also a reasonable one and the evidence of the plaintiff himself tended strongly to support it. The plaintiff testified that he was familiar with the letter written by his counsel and authorized Mr. McCarthy to write it. He also testified that he still claimed that the assignment "was invalid by reason of its being executed involuntarily and under duress." The fallacy in the plaintiff's argument lies in his assumption that he was entitled "to preserve the *status quo* until his rights could be determined." The effect of this letter was to deprive the defendant of all payments on account of alimony during a period of more than three years. Even though some downward revision of the decree might reasonably be expected, it has at all times since 1923 been obvious that the defendant is entitled to alimony in a substantial amount, due and payable upon the settlement of the trust estate. If, instead of taking matters into his own hands, the plaintiff had, at the time the letter was written, filed a petition for revision of the decree, including a prayer that full payment under the assignment be delayed, the rights of both parties might easily have been protected by an order for partial payment.

The court was entirely justified in finding that this letter constituted a deliberate attempt to interfere with the orderly operation of its decree and the plaintiff was properly adjudged guilty of contempt.

An order that he now purge himself from contempt by causing the payment to William E. Marvin, trustee, of a substantial portion of the amount heretofore awarded to Mrs. Kennard as alimony, allowing the balance to remain in the hands of the trustee in New York pending a final decision herein, would be proper.

*In the petition of Reginald P. Kennard, new trial:*

*in the petition of Ethyl C. Kennard, exceptions overruled.*

All concurred.